Urket *against* Coryell.
Wasser *against* Same.

An ancient receipt of the Receiver General for the price of lands, proved to be in the handwriting of his son, who did business in the office for his father, and occasionally signed the father's name, is evidence.

A certificate under the seal of the Land Office, signed by the Deputy Secretary, is evidence.

There is such an office in the State as the Land Office, and it is known by that name.

A deed from the warrantee of land conveying the warrant to another is evidence, even though the land be misdescribed in it.

An ancient deed is evidence where there is proof of the handwriting of the grantor and subscribing witness, who died many years ago.

A memorandum made by one who had been a Deputy Surveyor, not signed by

[Urket v. Coryell—Wasser v. Same.]

him as such, it not appearing whence it came or when it was made, is not evidence.

A return of unseated lands to the County Commissioners for taxation, is not evidence to show title in the party making such return.

Evidence is not admissible to show that the land in dispute had been reputed and represented for twenty or thirty years as the property of a party litigant, when offered to be given by a witness who never was on the land, or lived near it.

Where a party to the suit advised another to buy the land in dispute, engaging, if he did not like the title, to take it off his hands, which eventually took place, evidence by the first of these that between the vendor and him the risk was with him, and that the bond for the purchase money was still outstanding, is immaterial and inadmissible.

Articles of agreement concerning 72,000 acres of land belonging to M., N. & G., do not, without other evidence, embrace lands belonging separately to M.

Where titles are held by trustees under articles, for the benefit of subscribers to the articles, the trust does not take effect until there are subscribers.

Surveys are presumed to be made for him who is the owner of the warrants at the time, though there be no evidence that they were made for him; and they are his, though made at the instance and for the benefit of another, who had no right to the warrants.

A stranger without title cannot, by merely claiming land and paying taxes upon it, without showing he ever exercised any acts of ownership upon it, oust the owner, or devest his title by limitation of time.

Abandonment is not to be presumed from lapse of time against one who had warrants and surveys, and paid the whole purchase money for the land to the commonwealth; nothing will do short of actual ouster for twenty-one years.

A patent enures to the benefit of him who has the title, though issued to another.

The Court ought not to submit to the jury a point put by counsel, where there is no evidence to sustain it.

If a man wrongfully obtain a patent for land, and pay the taxes, the real owner may recover it from him without reimbursing to him the costs of patenting and the taxes.

Caveat by E. against patent to W. & D., afterwards withdrawn as to W., does not withdraw or concede anything as to D.; especially if D., two years afterwards, enters a caveat against E.'s title, under a claim of an opposite title.

THESE were actions of ejectment brought, one by Lewis S. Coryell against John Urket, the other by the same plaintiff against Daniel Wasser, in the Common Pleas of *Montgomery* county, for two tracts of land on the Lehigh river, one in the warrantee name of John Christ, the other in the warrantee name of Betsy Rice. William Abbott defended as landlord and owner. Both actions were tried together.

The plaintiff gave in evidence applications for 24 tracts of land on the 19th of March 1792, one in the name of Betsy Rice for 400 acres near or adjoining land applied for by Owen Rice, on the east side of Lehigh in Northampton county; and the other in the name of John Christ for 400 acres of land on the east side of the Lehigh, near or adjoining lands applied for by William Horsfield in Northampton county, endorsed " Wts. iss'd 3d April 1792 at 25 past 12 o'clock. 24 locations Robert Brown Esq."

The plaintiff then offered the following receipt, after proving that it was found among the papers of Jacob Eyerly, deceased:

[Urket v. Coryell—Wasser v. Same.]

*Receiver Generals Office Philadelphia.*

Received 25th day of May 1792 of John Christ the sum of Ten pounds in Pennsya. Certificates for 400 acres of land in the county of Northampton, granted to the said Christ by warrant dated the 3d ultimo.                    FRAS. JOHNSON, R. G.

£10 0 0 P. Cert. fees 10s. pd.

This being objected to, the plaintiff called Nathan Beach, Esq., who testified he was acquainted with the handwriting of Francis Johnson and his son. The son did nearly all the business. The signature to the receipt imitated the son's hand more than the father's. He thought it was the son's handwriting. The son was oftener in the office than the father. M'Kissack also signed receipts. On his cross-examination, he stated he thought he had receipts in which the son wrote Francis Johnson's name. He thought the son was John. When clerks signed, they did not always sign "for Francis Johnson, R. G." John Keble sometimes signed for Francis Johnson, R. G. He thought he had seen the son write the father's name.

The plaintiff then again offered the receipt, which was objected to by the defendants, but admitted by the Court, and exception taken.

Plaintiff then read the receipt, and offered copy of old purchase voucher (as he alleged) No. 9465, on which was the following certificate:

✱⌇⌇⌇⌇⌇⌇⌇✱<br>
⌇ The Seal of ⌇<br>
⌇ the Land ⌇<br>
⌇ Office of ⌇<br>
⌇ Pennsylva'a. ⌇<br>
✱⌇⌇⌇⌇⌇⌇⌇✱

I do hereby certify that the within is a copy of old purchase voucher No. 9465, filed in the Land Office.

     Attest,                       Jos. HENDERSON,

     Dec. 6, 1838.                     *Dy. Secretary.*

The defendants objected to its admission that it was not certified according to law, and that there was no such office in Pennsylvania as the "Land Office;" but the objection was overruled and the paper admitted, and a second bill sealed.

The plaintiff then offered, as alleged, copy of old purchase blotter No. 4, on which was the following certificate:

✱⌇⌇⌇⌇⌇⌇⌇✱<br>
⌇ The Seal of ⌇<br>
⌇ the Land ⌇<br>
⌇ Office of ⌇<br>
⌇ Pennsylva'a. ⌇<br>
✱⌇⌇⌇⌇⌇⌇⌇✱

*Pennsylvania, ss.*

I do hereby certify that the above is a true copy from an old purchase blotter, No. 4.

     Attest,                       Jos. HENDERSON,

Dec. 6 1838, Harrisburg, Pa.            *Dy. Secretary.*

This was objected to by the defendants, but admitted by the Court, and a third exception taken.

The plaintiff then read the following papers, viz.: 1792, April 3. Warrant to John Christ, 400 acres of land on east side of the Lehigh river, near or adjoining lands applied for by Wm Horsefield, in Northampton county.—Warrant to Betsy Rice, 400 acres near or adjoining lands applied for by Owen Rice, on the east side of the Lehigh, in Northampton county.—Draft of Survey, John

[Urket v. Coryell—Wasser v. Same.]

Christ 395 acres 32 per. Survey made 1793, September 2. Endorsed, Ret'd, &c. 9 March 1824.—Draft of Survey, Betsy Rice 402½ acres. Surveyed August 25 1793. Endorsed, Ret'd, &c. 9 March 1824.—Extracts from Book G, page 168, of Land Office, containing lists of return of surveys by Deputy Surveyors.—Geo. Palmer act. 6 March 1795, John Christ, 395.32. Do. do. Betsy Rice, 402.40.

The plaintiff then offered a deed poll from John Christ to Jacob Eyerly, dated November 26 1792, in the usual form, conveying all interest, &c. in warrant obtained out of Land Office for the commonwealth of Pennsylvania, bearing date April 3d 1792, for the quantity of 400 acres of land on the east side of the Lehigh, in the county of Northampton, near or adjoining lands of Joachim Wigman, and all his interest in any part or parcel of the land which may be obtained, located or surveyed in pursuance of the said warrant, with covenant for further assurance of said land. The defendants objected to this, 1. That the grantor had no interest to sell then; 2. That it was not for the land described in warrant or survey, nor the land in dispute: but the Court overruled the objection and admitted the deed in evidence, and the defendants took a fourth exception.

The plaintiff then offered a deed poll from Betsy Rice to Jacob Eyerly, dated 26 November 1792, conveying all her interest and property in warrant of 3d April 1792, to Betsy Rice for 400 acres on the east side of the Lehigh, near or adjoining lands of Joachim Wigman, and also all her interest and property in any land to be obtained, located, surveyed or held in pursuance of said warrant, with covenant for further assurance of said land. This was also objected to, but admitted by the Court, who sealed a fifth bill of exception.

The plaintiff then offered a deed poll from Jacob Eyerly to Robert Morris, dated 11th February 1793, with probate endorsed as follows:

*Northumberland County, ss.*

On the 31st day of May 1838, personally appeared before the subscriber, a Justice of the Peace in and for the said county, Robert Alexander, who being duly sworn doth depose and say, that he is a son-in-law of the late George Lesher, whose name appears as a subscribing witness to this deed; and he this deponent was well acquainted with the handwriting of the said George Lesher, having frequently seen him write; and this deponent having now in his possession a number of the signatures of the said George Lesher, with which he has compared the signature to this deed, and has no hesitation in deposing that he verily believes that to be the genuine signature of the said George Lesher.

　　　　　　　　　　　　　　　　ROBERT ALEXANDER.

Sworn and subscribed before me, ⎰
　the 31st day of May 1838.　⎱
　　　　CHARLES GALE.

[Urket v. Coryell—Wasser v. Same.]

*Northampton County, ss.*

On the 23d day of April 1838, personally appeared before the subscriber, one of the Justices of the Peace in and for said county, Ludwig Roth, who being duly sworn doth depose and say, that at the time the within deed was executed he was in the employ and worked for Jacob Eyerly, Jun., the signer and sealer of the within deed; and that he was personally and well acquainted with the said Eyerly, and was in the habit of seeing him write frequently about that time, and that to the best of his knowledge and belief the within was executed by the said Eyerly, Jun.

Sworn and subscribed before me, }
    April 23d 1838.                          }

WILLIAM G. SCOTT.

*Northampton County, ss.*

On the 29th day of August 1840, before me the subscriber, one of the Justices of the Peace in and for said county, personally appeared Christian Jacob Hutter, who being duly sworn according to law, deposeth and says, that he was well acquainted with Thomas Hartman, one of the subscribing witnesses to the within deed poll, and that the said Thomas Hartman is now dead, and has been dead, as deponent believes, not less than forty years, last past. And that deponent was also intimately acquainted with Jacob Eyerly, Jun., the grantor in the within deed poll; and from having often seen him write, was well acquainted with his handwriting, and has no doubt in saying that the within signature of Jacob Eyerly, Jun. is in the proper and genuine handwriting of him the said Jacob Eyerly, Jun.

JACOB WEYGANDT, [L. S.]

*Monroe County, ss.*

On the 7th day of September 1841, before me the subscriber, one of the Justices of the Peace in and for said county, personally appeared Andrew Whitesell, and being duly affirmed according to law, does declare and say that he was well acquainted with George Lesher, one of the subscribing witnesses to the within deed poll; and that the said George Lesher is now and for several years past has been deceased, as deponent has been informed by the family and relatives of the said George Lesher.

ANDREW WHITESELL.

Affirmed and subscribed before }
    me, September 7 1841.              }

JOHN MUSCH, Jun.

*Monroe County, ss.*

Before me the subscriber, one of the Justices of the Peace in and for the said county, on this 7th day of September 1841, personally appeared Christian J. Hutter, who being duly sworn according to law, deposes and says, that he was well acquainted with Thomas Hartman, one of the witnesses to the within deed poll; and from

[Urket v. Coryell—Wasser v. Same.]

having frequently seen said Thomas Hartman write, was well acquainted with his handwriting, and believes that the signature of the said Thomas Hartman to the said deed poll, subscribed as one of the witnesses thereto, is in the proper and genuine hand-writing of the said Thomas Hartman, and that the said Thomas Hartman is now and for more than ten years has been deceased.

CHRS. J. HUTTER.

Sworn and subscribed before me, }
     September 7 1841.             }

JOHN MUSCH, Jun.

The deed being objected to, the plaintiff called C. J. Hutter, Esq., who testified he was very well acquainted with the hand-writing of Jacob Eyerly, Jun., and had frequently seen him write. That they had many transactions together. He had no doubt that the signature to the deed was in his handwriting. The body of the instrument appeared to be his also. He had seen Hartman write, but was not so certain of it as of Eyerly's. He believed it to be Hartman's signature. On his cross-examination he stated he had seen Hartman write perhaps twenty or thirty times, and supposed it was thirty years since he had seen him write. Another witness testified he knew George Lesher, who was dead, and had seen him write his name once, but had not so very much know-ledge of his handwriting. That the signature looked very much like his handwriting, and he thought it was his. On his cross-examination he stated he had not seen Lesher for twelve years; that he died up towards Shamokin. The only time he recollected seeing him write was more than twenty-four years ago, when he signed a release. He had seen his handwriting frequently, but had never seen him sign his name but the once. He only knew he was dead by what he heard from his relations. It was said he died near Berwick, or on Fishing Creek; his brother-in-law told him he was dead. Another witness testified he did not know Lesher, but learned in Northumberland, about four years ago, that he last lived in Chilesquaque, about five miles from the mouth: that witness went there for the purpose and found his wife, who said he was dead. On his cross-examination he stated he did not know that he (witness) ever had an interest in the land: that he was acting as agent for those who had.

The deed was again offered and objected to by the defendants, but the Court admitted it, and sealed a sixth bill of exception.

Nathan Beach being again called, testified that he was well acquainted with the handwriting of William Gray, D. S. The plaintiff then offered and read the following papers:—Will of Robert Morris, dated June 13th 1804, proved May 23d 1806, devising his lands to his wife, Mary Morris.—Will of Mary Mor-ris, dated October 22d 1824, proved February 1st 1827, devising her lands to her daughter Maria, wife of Henry Nixon.—Deed from Henry Nixon and wife to Pearson A. Reading, dated August

v.—9             F *

[Urket v. Coryell—Wasser v. Same.]

16th 1838, recorded July 8th 1839, for the consideration of $4800, conveying all right, title and interest of the grantors to twelve tracts, including the lands in dispute.—Deed from Reading and wife to Lewis S. Coryell, dated June 29th 1839, for same.

John Christ then testified he lived in Nazareth in 1792, and knew Jacob Eyerly very well; that he (witness) had no interest in this land; that Eyerly took it up in his name and without his knowledge, and afterwards gave him a deed; that he (witness) never paid anything towards it, never attended to the surveying of it, or paid any fees on it. Eyerly dealt a great deal in lands. Witness executed this deed, and saw Levering and his father sign it as witnesses. On his cross-examination he stated he was near about 21 when he gave the deed to Eyerly.

The defendants gave in evidence the following deeds and papers: 1792, June 11, Caveats by Jacob Eyerly against granting patents to Thomas Wright and Thomas Dyer.—July 28, first Monday in October next appointed for hearing.—1793, January 7, this case is postponed until the first Monday of June next, to enable parties to go on the ground with William Gray, D. S., who is to re-survey lands of Mr. Wright, and execute the warrants of Mr. Eyerly, according to their locations, and point out the interferences if any. —1793, April 19, a letter from Robert Morris read, stating that he had purchased of Jacob Eyerly, Jun., the lands in contest between Eyerly and Thomas Wright, as well as the right of Wright, and therefore requested the caveats entered by Eyerly might be dismissed. Also deeds from Eyerly to Morris. Whereupon ordered that the said caveat shall be dismissed.—1795, August 5, Thomas Dyer entered a caveat against a warrant of April 3d 1792, Betsy Rice an older warrant 1784, John Carlile.—1840, September 25, certificate that no further proceedings had on Dyer's caveats are to be found.

The defendants then produced articles of association of the North America Land Co., dated February 20th 1795, between Robert Morris, John Nicholson and James Greenleaf, of the one part, and those who shall become members, &c. 72,000 acres of land in Northampton county, recorded in Northampton county in 1834.—Two patents to Jane Bradshaw and Jesse Dyer, one for the John Christ, the other for the Betsy Rice tract, dated March 9th 1824; to the admission of which the plaintiff objected, but the Court said the patents were evidence, but not the recitals therein, and admitted the patents.—Also will of Thomas Dyer, dated June 27th, 1796, proved August 5. Deed from Aaron Bradshaw and wife to Jesse Dyer, dated July 31st 1826, for this land with others. Deed, August 3d 1826, from Jesse Dyer and wife to Wm Abbot, for the consideration of $33,250, reciting patents and granting six tracts of land, including these two in dispute. Agreement, June 1, 1830, of commissioners of Northampton county, to take $50 for all arrearages of taxes on these and other lands. Receipt, June

[Urket v. Coryell—Wasser v. Same.]

19, 1830, to Wm Abbot by Treasurer for that amount. Receipt, June 11, 1836, A. H. Reeder, Esq., Treasurer, to Wm Abbot, for $103 taxes for 1832, 1833, 1834 and 1836, on six tracts, including the land in dispute.

Nathan Beach, Esq., being shown the following memorandum:

| | | | | |
|---|---|---|---|---|
| | " D. T. 1, | Owen Rice, . . . . . . | 403 | |
| | J. C. 2, | Betsy Rice, . . . . . . | 402 | 40 |
| | | John Stiner, . . . . . | 407 | 40 |
| | | Wm. Horsefield, . . . | 406 | |
| | | Guy Maxwell, . . . . | 394 | |
| | | John Christ, . . . . . | 395 | 32 |
| | | Gideon Burnet, . . . . | 400 | |
| | | Godfrey Belling, . . . | 435 | 40 |
| | | Stephen Burnet, . . . | 400 | |
| | | Stephen Burnet, Jun., | 400 | |
| | J. T. 3, | Hannah Hibert, . . . | 418 | 138 |
| | J. B. 4, | Joachim Wigman, . . | 406 | 40 |

(margin: Caveats Aug. 5, 1795.)

the above 12 tracts were surveyed for Mathias Hollenbach by Wm. Simpson, and returned 11th Feb. 1795.     G. PALMER."

Stated he did not wish to give a positive opinion about it, but that it did not look like George Palmer's handwriting, with which he was well acquainted.

C. J. Hutter, Esq., also stated, it did not look like Palmer's handwriting.

J. M. Porter, Esq. testified, he was acquainted with the handwriting of Palmer, and had been since 1809; that he believed it to be in his handwriting, except the lighter ink, in the margin. On his cross-examination, he stated, he did not recollect having seen George Palmer sign this way. He signed his name Geo., and reversed the " e," and added a flourish. He was accustomed to write his name, officially, very uniform. He was acquainted with the handwriting of John; he wrote a free hand.

The memorandum, with the certified copy of the surveyor's returns, before in evidence, were then offered in evidence, but objected to by the plaintiff, and rejected by the court, who sealed a seventh bill of exception.

The defendants then offered the book of record in the Commissioners' Office of Northampton county, containing the returns by deputy-surveyors of unseated lands to commissioners for taxation, p. 56, returning these lands as property of Mathias Hollenbach, as follows: Extract from book in Commissioners' Office in handwriting of Geo. Palmer, with the following caption:

" The following is a list of the returns made to the commissioners of the county of Northampton by persons holding lands therein not occupied and returned in pursuance of a law of the General Assembly, entitled 'An Act enjoining certain duties of the holders

of land-warrants not executed, and on the holders of unseated lands,' passed the 3d of April 1804."

| | Date of Warrants. | Quantity allowed. | Date of Survey. | Quantity of Land. | Situation and Owners. |
|---|---|---|---|---|---|
| | 1792 | | 1793 | | |
| Owen Rice ...... | April 3. | 400 | Aug. 14 | 403 | On the east side of the |
| Betsy Rice ...... | do. | do. | " 25 | 403 40 | Lehigh in Great Swamp. |
| John Stiner...... | do. | do. | " 30 | 407 40 | Matthias Hollenbach. |
| Wm. Horsefield .. | do. | do. | " 31 | 406 | |
| Guy Maxwell.... | do. | do. | Sept. 1 | 394 | 29 June 1819.  2d Feb. |
| John Christ ..... | do. | do. | " 2 | 395 32 | 1819, to M. Hollenbach |
| Gideon Burnet ... | do. | do. | " 2 | 400 | 29 June 1829. |
| Godfrey Belling.. | do. | do. | " 2 | 435 40 | do.    do. |
| Stephen Burret... | do. | do. | " 3 | 400 | do.    do. |
| Stephen Burret... | do. | do. | " 4 | 415 15 | do.    do. |
| Hannah Hibert... | do. | do. | " 5 | 418 138 | 18 June 1829. |
| Joachim Wigman. | do. | do. | " 14 | 406 40 | |

This was objected to by the plaintiff, and rejected by the court, who sealed an eighth bill of exception.

The defendants then offered in evidence the following deposition: John Stoddart, of the city of Philadelphia, merchant, aged 63, or thereabouts, being produced, sworn and examined on behalf of the plaintiff in the above-named cases, says, that he don't know that he ever saw an original deed poll from Betsy or Elizabeth Rice to Thomas Dyer, nor did he ever see any deed poll from John Christ to Thomas Dyer. He has no knowledge of either of these deeds. Being cross-examined on the part of the defendant: Did not know Thomas Dyer. He was dead before deponent knew anything of that country. I never was on the lands in dispute, but know where they are located. Never resided near the lands. Always resided in Philadelphia. Has been frequently at Stoddartsville, and staid for three or four weeks there at a time. Never was down the Lehigh to the mouth of Bear Creek. He sold the lands in controversy to William Abbot of the city of Philadelphia. [The lands in dispute were known and represented as the property of Thomas Dyer about 25 to 31 years before I sold to Abbot.] Plaintiff objected to the testimony above, in brackets, and all other of a like character. He was familiar with the titles to lands on the Lehigh, owning a great deal himself there from 1801 to 1820. The lands in dispute were reputed to be the property of Thomas Dyer. That was the representation of the neighbourhood. I sold the lands in question to William Abbot as agent for Jesse Dyer, the only son of Thomas Dyer, and the only child living at that time. Thomas Dyer was called the owner of said lands from 1799 until I sold them to William Abbot. This was what the people in that neighbourhood said — not my own knowledge. I have known Dyer and Bradshaw being up frequently looking after these lands and exercising acts of ownership over them. They claimed them and offered them for sale, and sold a good many of

the adjoining tracts. Bradshaw married Thomas Dyer's daughter. Being again examined in chief: The nearest neighbours to these lands were from 3 to 7 miles. Mr Sayer was the nearest neighbour. He lived at the 7 mile house, on the turnpike. Never heard Sayer say anything about these lands. He was a new comer at that house—the next nearest Conrad Sax. He lived on the Easton and Wilkesbarre turnpike. "I have heard Sax say that Thomas Dyer owned all the lands from the mouth of Bear Creek to Lowrytown, about five or six miles—he bought twelve or fourteen tracts of the heirs of Thomas Dyer, about 400 acres in a tract. The representation was that Thomas Dyer owned five-and-twenty or thirty tracts, or maybe more. The representation was that Thomas Dyer owned the lands nearly down to Mauch Chunk; some were near Lowrytown, on the banks of the river Lehigh; don't know that Jesse Dyer or Bradshaw was on the tract in the name of Betsy Rice and John Christ; that they were at the falls looking after the lands not sold, and the lands afterwards sold to Abbot, which were the lands principally held by them at this time. He thinks he sold six tracts to Abbot."

The plaintiff objected to that part of the deposition which is under quotation; which was rejected by the court, who sealed a ninth bill of exception.

The defendant then offered the following deposition of Pearson A. Reading: "I bought some lands from Mr Nixon about three years ago, situated on the Lehigh. The first knowledge given me of those lands was by Mr Dean, the agent of Mr Nixon. I think he called upon me, in the first instance, of his own accord, although I cannot speak positively as to that. If my memory serves me, he came back to me a second time, probably at the request of another person; and the reason of his coming to me a second time by the desire of another person, probably at the request of the third person, was that I told him I wished to look over the papers and consult another person before I gave an answer whether I would purchase the lands or not. I saw the person; conferred with him on the subject of the lands, their value and title; was satisfied by the representations of title made by the agent of Mr Nixon, and became the purchaser of the lands. That third person was Lewis S. Coryell. Mr Coryell intimated to me in a conversation and stating the value of the lands, and said that he believed the purchase would be a valuable one; and to induce me to purchase, he said that if I became tired of my purchase he would take it off my hands, so well satisfied was he that the purchase was a good one. I cannot say whether Coryell or Dean had been in conversation about the lands before, but they were, I knew, about the time I had the conversations with Dean. Under Coryell's representations I made the purchase of Nixon. I really forget what I gave an acre for these lands. I was looking for a paper to satisfy myself of the price, but was called away before I

[Urket v. Coryell—Wasser v. Same.]

found the papers.  I subsequently saw Mr Coryell, and told him
that Mr Abbot said the title to the lands was in him, and that I
did not buy lands from him (Coryell) to buy trouble ; that although
the claim of title to these lands, as handed to me, appeared good
and satisfactory, yet inasmuch as I might be obliged to encounter
a lawsuit in protecting the title against Mr Abbot and others
who might claim under him, I would prefer conveying the title for
those lands to him at the price they cost me, charging no advance
whatever, save only the expense of title papers I had been at.
That inasmuch as he owned lands in the neighbourhood, had saw-
mills and was carrying on the lumber business in that district of
country, they would suit him much better than they did me.  He
said very well, I will take them; and the conveyance was made
accordingly.  I don't recollect what title papers were submitted
to me by Dean.  I submitted the title papers to Geo. Woodward.
He drew the title from me to Coryell.  I think some of the title
papers were procured from Wilkesbarre.  I know nothing of it
as to my own knowledge.  I can't tell where the other papers
were brought from.  They were brought to me by Mr Dean, and
after undergoing a satisfactory examination, the purchase was
completed.  I do not now recollect any of the deeds so as to be
able to state who were of the parties.  I think Mr Nixon had the
deed prepared for me.  It was part of the understanding that he
should have the deed prepared, and I was to pay part of the ex-
penses.  *Between Nixon and me the risk of the title was to be with
me.*  We had no conversation on that subject.  I do not know
how the mortgage runs in this respect.  *The bond for the purchase
money is still outstanding.*  I could not describe from recollection
any of the papers.  Cross-examined : I did not say in my exami-
nation in chief or did not intend to say that I bought the lands
from Coryell, to buy trouble.  I meant to say that I did not want
to buy lands, to buy trouble ; and that inasmuch as Mr Abbot
claimed the lands, I would rather sell them to him (Coryell) at
what they cost me, saving only the expense of the title papers.  I
never bought these lands from Coryell.

The plaintiff objected to all that part in italics, which was
rejected by the Court, who sealed a tenth bill of exception.

The plaintiff read the following papers :  Receipt of Wm Gray,
D. S., proved by Nathan Beach, and endorsed on deed in evidence
from Jacob Eyerly to Robert Morris, as follows :

" Received, April 19, 1793, of Robt Morris, the twelve warrants
within described, in order that the land mentioned therein may be
surveyed.                                        WM GRAY, D. S."

Also warrant, July 1, 1784, to John Carlisle for 400 acres on the
west side of the Lehigh, two miles south of Bear Creek.

John Christ being called again, stated he never signed any other

deed poll for these lands, to his knowledge, except the one he gave Jacob Eyerly.

The defendant again offered the memorandum of George Palmer, 11th February 1795, which was objected to by the plaintiff, and again rejected by the Court, who sealed an eleventh bill of exception.

There was then read a certificate of Jacob Sallade, dated September 25 1840, that he could find no return of survey on the warrants in the names of John Bradshaw 400, John Carlisle 400, Joseph Shaw 400, all dated 1st July 1784.

The plaintiff requested the Court to charge on the following points :

1. That unless the defendants have proved that the 72,000 acres mentioned in the articles of agreement of the North American Land Co. actually included the lands in dispute, that agreement cannot be considered by the jury as a conveyance of those tracts. It is the business of the defendants to show that they are so included.

2. If Robert Morris, or those under whom he claimed, paid the purchase money and the Land Office fees, delivered the warrants to the deputy surveyor, and the surveys were thereupon made and returned, the jury should presume, in the absence of evidence on the subject, that the surveys were made at the instance of Robert Morris.

3. That the mere payment by the defendants of taxes from 1830 to 1836, and their visiting them occasionally and claiming to hold them, cannot raise a presumption that plaintiffs abandoned the title, nor prevent them from recovering.

4. That plaintiff has shown a title in itself better than the defendants' patent in itself.

The defendants requested the Court to charge on the following points :

1. That if the lands in dispute are embraced in the articles of agreement of 20th February 1795, relative to the North American Land Co., the plaintiff cannot recover.

2. If Robert Morris, or those under whom he claimed, did not procure the surveys to be made and returned, the surveys made and returned will not enure to their benefit.

3. That if those under whom the plaintiff claimed lay by from 1795 to 1838, without claiming or exercising any acts of ownership of the lands, and if Thomas Dyer and those who claimed under him during all that time claimed and exercised acts of ownership upon the lands, and paid whatever taxes were assessed upon them, the jury may presume an abandonment by and an ouster of those under whom the plaintiff claims, which will preclude a recovery in this case.

4. That the patents given in evidence under which the defendants claim, are *primâ facie* evidence of title, and will entitle the

[Urket v. Coryell—Wasser v. Same.]

defendants to a verdict, unless the plaintiff has shown a better title.

5. That if the jury believe that Thomas Dyer procured the survey to be made by George Palmer, D. S., for himself, in pursuance of an arrangement between Robert Morris or Eyerly and himself, then this is a circumstance, taken in connection with the neglect of Morris to perfect his title, or look after the land, from which the jury may infer that Dyer had title to the lands in dispute.

6. That the patents conveyed the legal title to these lands, to the heirs of Thomas Dyer. That if William Abbot be a *bonâ fide* purchaser without notice, the plaintiff could not recover, even if otherwise entitled, without having tendered the costs of the patent with interest, and the amount of taxes paid by him with interest, before suit brought.

The court (JESSUP, President) charged the jury as follows:

The plaintiff in these cases is bound to show a good title, or he cannot recover. The title of the defendants is of no consequence; if the plaintiff have not title, a verdict cannot pass in his favour. It is first then to be ascertained whether the plaintiff have title to those lands, and if it be ascertained that he has, then the question will be raised, has the defendant shown a better title? The plaintiff showed an application in the names of Betsy Rice and John Christ each for 400 acres on the Lehigh, dated the 19th of March 1792. These applications were made by Jacob Eyerly, Jun., for his own use and benefit. The warrantees, Rice and Christ, lent their names for that purpose to him. On the 3d of April 1792, the warrants issued on these applications. On the 25th of May 1792, £10, the amount of the purchase money for 400 acres, was paid for each of these tracts to the State, by Jacob Eyerly, Jun. On the 25th of August and 2d of September 1793, surveys were made on these warrants. On the 6th of March 1795, these surveys were returned to the proper office by the deputy-surveyor, and the returns accepted. Jacob Eyerly, Jun., at this time having paid the purchase money, would have been (had he not conveyed away his interest) entitled to a patent for the land, and that would have perfected his title. It also seems by the evidence that Christ and Rice, who held the warrants merely as trustees for Eyerly, had, on the 26th of November 1792, conveyed by their deeds poll their interest to Eyerly. Eyerly, on the 11th of February 1793, conveyed these lands to Robert Morris. By his will, dated 13th June 1804, Robert Morris devised these lands to his wife Mary Morris, who by her will dated 22d October 1824, devised them to Maria Nixon. On the 16th of August 1838, Henry Nixon and Maria his wife conveyed to Pierson A. Reading, who on the 29th of June 1839, conveyed them to Lewis S. Coryell, the plaintiff.

This is a clear and plain paper title, bringing down regularly the land held under these warrants to the plaintiff, and entitling

him to recover unless the defendant has shown a better title.   If then this title is defeated, it must be in the evidence subsequently adduced by the defendants.   The first inquiry in order of time is, were the proceedings before the board of property such as to affect the plaintiff's title?   The evidence given shows that on the 11th of June 1792, Jacob Eyerly entered a caveat against Thomas Dyer and Thomas Wright for land on the east side of the Lehigh. The 28th of July was appointed for a hearing; 31st January 1793 proceedings were had before the board of property, and William Gray was ordered to go upon the ground and make the needful examinations in order to enable the board to decide the cause properly, and the hearing again postponed to the third Monday of June; on the 19th of April 1793, Robert Morris, who had purchased the lands from Jacob Eyerly, requested these caveats dismissed, and they were accordingly dismissed.   On the 5th of August 1795, Thomas Dyer entered a caveat against the tract in the name of Betsy Rice, on the ground of an older warrant to John Carlile, but no notice thereof or any proceedings were had. There is nothing in these proceedings in themselves, or connected with any other part of the case, which can prevent the plaintiff's recovering.

The defendants further object that they have shown title out of the plaintiffs by the conveyance of 24th July 1795, of Robert Morris to the North American Land Company, which has been given in evidence, and upon this the defendant has his first point, to which the Court reply, 1. That the only evidence that these lands were embraced in the articles of agreement is, that the parties to that agreement, in their schedule, state " 72,000 acres of land in Northampton county" as belonging to " Morris, Nicholson and Greenleaf."   This is a vague description, and cannot, without something more definite, be held to embrace the tracts which by the evidence were the separate property of Robert Morris.   2. There is no evidence of subscription by any person to the articles of agreement of the North American Land Company; and as the titles were, only held by the trustees for the benefit of the subscribers to the articles, and those who might thereafter become purchasers, owners or holders of shares in the company, it not appearing that the object for which the trust was created ever existed, the title of Robert Morris and of his heirs would not have been devested by the articles of agreement, for there were no persons to take under the trust; and until there were subscribers, the trust would not take effect.

The court answer to the 2d point of defendants: There is no evidence that this survey was not properly made for the person who held the warrants.   By order of the Board of Property the warrants went into the hands of William Gray, a deputy-surveyor, and were executed and returned by George Palmer, another

deputy-surveyor. There is no evidence that these surveys were made for any one else than Morris; nor is there any evidence of claim under these warrants by Dyer until the issuing the patent to his heirs on the 9th of March 1824. When Thomas Dyer entered his *caveat* on the 5th of August 1795, he claimed adversely to the warrant of Betsy Rice, and until the granting of the patent as above stated does not appear to have set up any claim to the tract. Under the evidence the court instruct the jury that there is nothing in the case from which it can be inferred that these surveys were not made for the benefit of Morris, who was the owner of the warrants at the time the surveys were made.

The defendants contend that they, having a patent from the Commonwealth, are upon that entitled to recover, unless plaintiff has shown a better title, and here raise their 4th point. The point is correct, and it is to be ascertained whether the plaintiff has shown a better title. If the person obtaining a patent be not entitled to it, he acquires no title thereby. He cannot recover the land unless entitled to the patent. Our inquiry therefore is, were the heirs of Thomas Dyer entitled to this patent? If not, it cannot defeat the plaintiff's right to recover. The plaintiff sets up a title prior to the patent, and is not to be affected by the recitals in it. It appears that Jacob Eyerly paid the purchase money to the State, and that Christ and Rice, the warrantees, conveyed to him. The deeds poll duly proved are a part of plaintiff's title. Nothing was done by Dyer or his heirs to authorize the issuing the patents to them. One of the warrantees has testified before you that he gave no other deed poll than the one here given in evidence. The heirs of Thomas Dyer, then, were not the persons to whom the patents for these lands ought to have issued, and as *against* the elder title of the plaintiff, it cannot avail them to defeat his recovery.

As connected with this subject of the patent, the court reply to. the 6th point. If a man wrongfully obtain a patent and under claim of it pay taxes, he cannot raise an equity in himself or his vendee as against the real owner to be reimbursed for the costs of patenting and taxes. If he have right to the patent, he holds the land. The plaintiff was not bound to pay for a patent granted against his title in subversion of it, and even given in evidence to defeat it, nor for the taxes paid by the person claiming that patent. It issued to his injury and in wrong, and neither the wrong-doer nor his vendee can recover from the person injured what they thus paid.

The third point, as stated, is correct, but is it sustained by the evidence? The only acts of ownership exercised by any of the parties are testified of by John Stoddart, as follows: "I have known Dyer and Bradshaw being up frequently looking after these lands and exercising acts of ownership over them. They claimed them—offered them for sale and sold a good many of the adjoining

tracts. I was never on the land." Then comes the payment of taxes for the years '29, '30, '32, '33, '34 and '35. It does not appear that other taxes were assessed on the lands. Next we have the taking out of the patents in 1824. It does not appear that Morris or other persons for him ever exercised acts of ownership over or paid any attention to these lands until 1838. Now while the court affirm the proposition assumed in the point as correct, they instruct the jury that the facts in the case as contained in the evidence do not show such acts of ownership, and such payment of taxes by the defendant and those under whom they claim, as from them the jury can presume an ouster of the plaintiff and such an abandonment of the land by him as will defeat his title.

There is nothing in the case upon which the 5th point can be raised—no evidence to sustain it.

The 1st, 2d and 3d points of the plaintiff as before explained, are correct. To the 4th the answer is to be found in the view given to the jury in the charge and in the answer to the defendants' points. The jury will observe that the parties both claim under the same warrants and the same payment of the purchase money to the Commonwealth. The plaintiff's title is not defeated by an abandonment, nor by the conveyance to the North American Land Company. He was clearly entitled to the patent under the evidence, and there does not appear any defect in his title or anything shown by the defendant which should prevent his recovering.

The defendant excepted to the charge, and assigned the following errors:

1. The court erred as stated in the several bills of exceptions.

2. In their answers to the defendants' points.

3. In what they said respecting the effect of the proceedings before the Board of Property.

4. In what they said respecting the conveyance to the North American Land Company.

5. In all they said respecting the question of abandonment and the right of the plaintiff to recover.

6. In taking the whole case from the jury, leaving nothing for them to decide.

*Maxwell* and *Porter*, for plaintiffs in error.
*Reeder* and *Mallery*, contra.

The opinion of the Court was delivered by

KENNEDY, J.—These two causes were tried together in the court below by the same jury, in each of which the same questions were raised by the counsel of the respective parties, and decided by the court. The plaintiffs here were the defendants below, where their counsel took no less than eleven bills of exception to the opinion of the court on points of evidence, all of which are assigned for error here, beside other errors founded on exceptions to the charge

[Urket v. Coryell—Wasser v. Same.]

of the court to the jury, and to the answers of the court, given on points submitted by the counsel, for their instruction thereon, to the jury. A very brief notice of them will be sufficient, as we are clearly of opinion that there is not even any plausible ground upon which they can be sustained.

The first exception to evidence was, to the admission of a paper purporting to be a receipt given by Francis Johnson, Receiver General of the Land Office, on the 25th of May 1792, to John Christ for £10 in Pennsylvania certificates, on account of 400 acres of land in the county of Northampton, granted to Christ by warrant dated the 3d of April 1792. Before it was offered to be read in evidence, proof was made showing that the receipt and name of Francis Johnson set to it as Receiver General were in the handwriting of his son, who did business in the office for his father, and occasionally signed the father's name alone, without showing that it was done by the son for the father. The objection to its being read in evidence was, that there was not sufficient proof made of its having been given and signed under the authority of the Receiver General, so as to entitle the plaintiff below to submit it as evidence to the jury. After so great a lapse of time, any slight evidence would have been sufficient to have justified the court in leaving it to the jury as a question of fact to be decided by them, whether it was a receipt given under the authority of the Receiver General of the Land Office or not. But the evidence given of its being so was strong, and, in the absence of all testimony tending to show the contrary, it became conclusive as it were.

The ground of the objection to the admission of the evidence in the second and third bills of exception, is the same. They will therefore be considered together. The evidence mentioned in the second bill as objected to and admitted, is a *certificate* under the seal of the Land Office, signed by Jos. Henderson, Deputy Secretary, in the following words and figures:

> *The Seal of the Land Office of Pennsylva'a.* I do hereby certify that the within is a copy of old purchase voucher No. 9465, filed in the Land Office.
>
> Attest,                                    Jos. HENDERSON,
> Dec. 6, 1838.                          *Dy. Secretary.*

The evidence mentioned in the third bill of exception, is a certificate in the following words and figures:

> *The Seal of the Land Office of Pennsylva'a.* *Pennsylvania, ss.*
>
> I do hereby certify that the above is a true copy from an old purchase blotter, No. 4.
>
> Attest,                                    Jos. HENDERSON,
> Dec. 6, 1838, Harrisburg, Pa.          *Dy. Secretary.*

These certificates were objected to, because, as the defendants alleged, they were not certified according to law, and also because there was no such office in Pennsylvania as the "Land Office."

[Urket v. Coryell—Wasser v. Same.]

That such an office, known too by that name, existed, first under the proprietary government, is not only shown by the first section of the Act of Assembly, passed by the Legislature of the Commonwealth on the 9th of April 1781, entitled " An Act for establishing a *Land Office*, and for other purposes therein mentioned ;" but an office by that name, as indicated by the title of the Act, is established by the second section of it, to consist of three persons or officers, called or known by the names of the Secretary of the Land Office, Receiver General, and Surveyor General; and in every act of the Legislature relating to the disposition of lands by the commonwealth, it is designated and spoken of by that name. And by the eighth section of the Act of the 29th of March 1809, entitled " An Act abolishing the offices of Receiver General and Master of the Rolls, and transferring the duties therein performed to other offices, and for other purposes," it is made " the duty of the Secretary of the *Land Office* to prepare a seal, to be styled the *Seal of the Land Office of Pennsylvania*, which, from and after the 10th day of May then next following, shall be applied to all patents, warrants, and *other papers* authenticated in said office." Now, that there is such an office in the State as the " Land Office," and known by that name, and properly by no other, is thus incontrovertibly established. And to show that certified copies of all records, documents and papers, of the secretary of the Land Office, when duly certified, shall be received in evidence, I refer to the first section of the Act of the 31st of March 1823, entitled " An Act making copies of certain documents, records and papers, evidence in courts of justice," which enacts that " copies of all records, documents and papers, in the offices of the Secretary of the Commonwealth, *Secretary of the Land Office*, &c., when duly certified by the officers of the said offices respectively, shall be received in evidence in the several courts of this Commonwealth, in all cases where the original records, documents and papers would be admitted in evidence." The only colourable objection that existed against these copies being read in evidence, in this case, was, that they do not appear to be signed by the secretary of the Land Office. But they are certified under the seal belonging to his office, and attested by the deputy secretary, which we think is sufficient; for by the eighth section of the Act of 1809, already referred to, the secretary himself is required to sign all patents and warrants to be issued thereafter to which the seal shall be applied ; but nothing is said about his signing other papers authenticated in said office, though it is required that the seal shall be affixed to them. This requisition, at most, does not seem to have been intended to be applied to copies, when given of original documents and papers remaining in the office; the affixion of the seal of the office, with the attestation of the deputy secretary, who is authorized to act for the secretary in most cases, must be considered a sufficient authen-

V. — G *

tication of the copies to render them admissible evidence, where the originals would be so if produced.

The fourth bill of exception was to the admission of a deed from John Christ to Jacob Eyerly, dated the 26th of November 1792, conveying all interest, &c. in a warrant obtained from the Land Office of the Commonwealth of Pennsylvania, dated April 3d 1792, for 400 acres of land on the east side of the Lehigh, in Northampton county, near or adjoining lands of Joachim Wigman, and all his interest in any part or parcel of the land which might be obtained, located or surveyed in pursuance of the said warrant, with a covenant for further assurance of said land. This deed was offered in evidence after the warrant therein mentioned, and a survey made in pursuance of the same, had been given in evidence by the plaintiff to support his claim to the land in controversy; and was objected to by the counsel of the defendants because the grantor, as they said, had no interest to sell and convey at the time; and again, because it was not for the land described in the warrant or survey, nor for the land in dispute. There does not appear to be the least force in any of these objections. The grantor being the warrantee, or person to whom the warrant was granted, though nominally only, had undoubtedly the right, as well as the capacity, to convey the warrant and the land surveyed under it to the grantee, so as to invest the latter with the legal title, and more especially so as he was the purchaser of the warrant from the State, and therefore the equitable owner of it, as also of the land that had been or might thereafter be surveyed by virtue of it. And whether the deed was for the same land mentioned in the warrant, or included in the survey made in pursuance of it, or was not for the land in dispute, was a question of fact to be left to the jury; but even a misdescription of the land in the deed conveying the warrant would not, I apprehend, make it invalid, so as to render it inadmissible as evidence, or destroy its efficacy in passing the right of the warrantee to the land actually held under the warrant.

The fifth bill of exception was to the admission of a deed from Betsy Rice to Jacob Eyerly, dated the 26th of November 1792, conveying all her interest and property in a warrant dated the 3d of April 1792, granted to her by the Commonwealth, for 400 acres of land on the east side of the Lehigh, near or adjoining lands of Joachim Wigman, and also all her interest and property in and to any land to be obtained, located or held in pursuance of said warrant, with a covenant for further assurance of the same. Before this deed was offered in evidence, the warrant therein mentioned, and a survey of 402½ acres made in pursuance thereof, were given in evidence. The objections to this latter deed's being given in evidence were the same with those made to the giving of the first deed in evidence, and therefore require no other or further answer than what has been given to the first.

The sixth bill of exception was to the reading in evidence a deed from Jacob Eyerly to Robert Morris, dated the 11th of February 1793, conveying the warrants granted to John Christ and Betsy Rice, and the lands surveyed or to be surveyed in pursuance thereof, to the said Robert Morris, his heirs and assigns. The execution of the deed appeared to be attested by George Lesher and Thomas Hartman as subscribing witnesses. Before it was offered to be read in evidence, proof was given that Lesher and Hartman were both dead many years before the trial, and that their signatures to the deed as witnesses were in their respective handwriting, and that the signature of Jacob Eyerly to the deed as grantor was also in his own proper handwriting. This proof was made by witnesses who testified that they had seen Lesher, Hartman and Eyerly respectively write while living, and thus became acquainted with their respective handwritings from having seen them write. The reading of the deed in evidence, however, notwithstanding all this proof, was objected to, because its execution was not sufficiently proved to entitle the plaintiffs below to put it in evidence before the jury. It is really difficult to perceive what further proof the plaintiff could possibly have made, after so great a lapse of time, and seeing the witnesses to the deed and the grantor were all dead. It is not right to make such groundless objections to the admission of evidence. It is seldom, if ever, that any advantage can be obtained thereby on the part of the party making them; but he, on the contrary, may frequently lose, by inducing a belief that they are made by him because he thinks his case a desperate one, and conceives that he has nothing better to rely on.

The seventh bill of exception was to the rejection of a memorandum, which the defendant's counsel offered to read in evidence, with the name of " G. Palmer" signed to it, and said to be all in his handwriting, except an entry in its margin. The two first witnesses, however, produced by the defendant for the purpose of proving it to be in the handwriting of G. Palmer, testified that they were acquainted with the handwriting of George Palmer, but they did not think it was his; but the third witness testified that he believed it was. It appeared that Palmer had been a deputy-surveyor, at one time, and the memorandum offered in evidence was alleged by the counsel of the defendants to have been made by him as such; but it was not signed by him as such, nor did it appear whence it came, nor where it was made; so that there was no pretence for admitting it in evidence as an official paper; and upon no other ground could it possibly have been claimed to be admissible as evidence.

The eighth bill of exception was to the rejection of a book from the commissioners' office of the county, containing returns made by deputy-surveyors to the commissioners of unseated lands for taxation, in which Mathias Hollenbach was set down as the

owner of the lands surveyed under the warrants granted to John Christ and Betsy Rice. It would make sad.work, if such returns were to be received as evidence of title. Though deputy-surveyors are required, upon application of the commissioners of the several counties, by the 1st section of the Act of the 3d of April 1804, entitled "An Act directing the mode of selling unseated land for taxes," to make out a correct return *to them* of *all the* lands surveyed within their respective counties, whereof, as deputy-surveyors, they may have draughts, maps or plans, made by themselves or their predecessors in office; which returns shall include a list of the number of acres contained in each survey, and the names and surnames of the original warrantees, the waters on which the same is situate, &c.; but they are not required, nor are they authorized to say or determine to whom the lands belong. Indeed, it is very obvious, that not having the means of ascertaining anything of the sort, they would be very incompetent to perform such a task. The evidence offered was therefore very properly rejected by the court.

The ninth bill of exception was to the rejection of certain parts of the deposition of John Stoddart, taken under a rule of the court on behalf of the defendant. The parts rejected went to show that the land in dispute had been *reputed* and *represented*, for twenty or thirty years, to be the property of Thomas Dyer, from whom the defendants below derived their claim to it. That such was the *representation of the neighbourhood*, of which, however, the witness had *no* knowledge himself. The witness was never on the lands in dispute, never resided nearer to them than in Philadelphia; nor was there a residence of any person nearer to them than from three to seven miles. It would be most extraordinary indeed, and lead to the most crying injustice, if the real owners of lands, whether seated or unseated, were permitted to be affected in their ownership of them by such evidence. It was therefore most rightly rejected.

The tenth bill of exception was to the rejection of a small part of the deposition of Pearson A. Reading, taken and offered as evidence on behalf of the defendants below. The witness had bought the lands in dispute of Henry Nixon and his wife; but previously to his doing so he consulted Lewis S. Coryell, the plaintiff below, in respect to it, who advised him to make the purchase, and if he did not like it afterwards, he, Coryell, would take it off his hands. The witness accordingly made the purchase, and, in consummation of it, obtained a deed of conveyance from Nixon and wife for the lands; but afterwards, when he discovered that Abbot, who defended in the court below as the landlord of Urket and Wasser, the defendants, claimed to have a title to the land, he told Coryell of it, and proposed selling and conveying the land to him at the same price he was to pay for it, as he did not wish to be involved in a lawsuit about it. Upon which Coryell agreed

to take the land, and the witness accordingly conveyed it to him, as appeared by his deed given in evidence as part of the plaintiff's title below. The witness, in his deposition, stated all this, in substance, and also in addition, that " between Nixon and him, the risk of the title was to be with him ;" and that " the bond for the purchase money was still outstanding." These were the parts of the deposition objected to by the plaintiff's counsel below, and rejected by the court as not being admissible in evidence. It is not easy to perceive their relevancy, nor why they were objected to more than some other parts of the deposition. I cannot conceive how the admission of them could have prejudiced the plaintiff, nor how, on the other hand, they could, had they been admitted, have advanced the interest of the defendants. Whether the witness had been a *bonâ fide* purchaser of the land for a valuable consideration, actually paid by him, without notice of Abbot's claim, was not a question that arose in the cause, so as to make the evidence rejected admissible under any view that could be taken of the case. Being therefore wholly immaterial, no error could arise from its rejection by the court.

The eleventh bill of exception was the rejection of the memorandum with the name of " G. Palmer" set to it, that was mentioned above, in the seventh bill of exception which was offered by the counsel of the defendants, afterwards, a second time, and rejected by the court. It has been shown already that it was properly rejected by the court, when it was first offered ; and as no evidence was given subsequently, changing its character or presenting it in any new light, nothing further need be said in respect to it, to show that it was still inadmissible.

The errors next in order are exceptions taken by the counsel for the defendants below, to answers given by the court, to six points submitted by them to the court for their direction thereon to the jury. The first point was, " that if the lands in dispute were embraced in the articles of agreement of the 20th of February 1795, relative to the North American Land Company, the plaintiff could not recover." On this point the court told the jury, 1st, " that the only evidence that these lands were embraced in the articles of agreement is, that the parties to that agreement, in their schedule, state ' 72,000 acres of land in Northampton county,' as belonging to ' Morris, Nicholson and Greenleaf.' This is a vague description, and cannot, without something more definite, be held to embrace the tracts which by the evidence were the separate property of Robert Morris." 2d. " That there was no evidence of any subscription by any person to the articles of agreement of the North American Land Company ; and as the titles were only held by the trustees for the benefit of the *subscribers* to the articles, and those who might thereafter become purchasers, owners or holders of shares in the company, and it not appearing that the object for which the trust was created ever existed, the title of

v. — 11

[Urket v. Coryell—Wasser v. Same.]

Robert Morris and of his heirs would not have been devested by the articles of agreement, for there were no persons to take under the trust, and until there were subscribers the trust would not take effect." We consider the answers given by the court, on this first point, unexceptionably correct, and the reasoning of the court therein shows them to be so.

The 2d point submitted was; " if Robert Morris, or those under whom he claimed, did not procure the surveys to be made and returned, the surveys made and,returned would not enure to their benefit." To which the court answered; " there is no evidence that the surveys were not properly made for the person who held the warrants. By the order of the Board of Property the warrants went into the hands of William Gray, a deputy-surveyor, and were executed and returned by George Palmer, another deputy-surveyor. There is no evidence that these surveys were made for any one else than Robert Morris; nor is there any evidence of claim *under these warrants by Dyer*, until the issuing of the patents to his heirs on the 9th of March 1824. When Thomas Dyer entered his *caveat*, on the 5th of August 1795, he claimed adversely to the warrant of Betsy Rice; and until the granting of the patent as above stated, does not appear to have set up any claim to the tract. Under the evidence, the court instruct the jury that there is nothing in the case from which it can be inferred that these surveys were not made for the benefit of Robert Morris, who was the owner of the warrants at the time the surveys were made." Neither can we perceive any evidence given in the cause to the jury, tending in the slightest degree to show that the surveys were not procured to be made by Robert Morris, and it would therefore have been error in the court below to have submitted such a question of fact to the jury, without some evidence given going to show that the surveys were not made for Robert Morris. It was shown clearly that he was the owner of the warrants at the time; but even in the absence of all testimony tending to prove for whom the surveys were made, the jury were, in law, bound to presume that they were made for Robert Morris, he being the owner of the warrants. But suppose the surveys had been shown to have been made at the instance and for the use of another person, who had no right to the warrants, they being still the property of Robert Morris, the latter most unquestionably might have adopted and claimed the benefit of them; so that this point of the defendant might well have been answered in favour of the plaintiff below, even had there been evidence showing that the surveys were at the instance and for the use of another person.

The third point was, " That if those under whom the plaintiff claimed lay by from 1795 to 1838, without claiming or exercising any acts of ownership over the lands, and if Thomas Dyer and those who claimed under him during all that time claimed and

exercised acts of ownership upon the lands, and paid whatever taxes were assessed upon them, the jury may presume an abandonment by, and an ouster of, those under whom the plaintiff claims, which will preclude a recovery in this case." To this point the court answered, " That as stated it is correct, but is the point sustained by the evidence?" And then say that " the only acts of ownership exercised by any of the parties are testified of by John Stoddart, whose evidence is as follows: ' I have known Dyer and Bradshaw being up frequently looking after these lands, and exercising acts of ownership over them. They claimed them, offered them for sale, and sold a good many of the adjoining tracts. *I was never on the land.*" Then comes the payment of taxes for the years 1829, '30, '32, '33, '34 and '35. It does not appear that other taxes were assessed upon the lands. Next we have the taking out of the patents in 1824. It does not appear that Morris, or other persons for him, ever exercised acts of ownership over, or paid any attention to, these lands until 1838. Now, while the court affirm the proposition assumed on this point as correct, they instruct the jury that the facts in the case, as contained in the evidence, do not show such acts of ownership, and such payment of taxes by the defendants and those under whom they claim, as from them the jury can presume an ouster of the plaintiff, and such an abandonment of the land by him as will defeat his title." It is perfectly clear that the court answered this point as favourably for the defendants as they had any right to claim. An ouster of the plaintiff, or those under whom he claimed until shortly before the commencement of this action, was entirely out of the question; for there was not even a spark of evidence given, going to show that Dyer or Bradshaw ever were on the land in dispute, or ever directed any act as owners to be done on it. And although John Stoddart does testify that he knew of their exercising acts of ownership over it, yet it is manifest that he only meant that they claimed it and offered it for sale, for he swears *he never was on the land,* and of course never could have seen them do any act of any kind on it. It lay in the midst of a wilderness, only visible to those who actually went on it, a thing that the witness never did. Paying taxes merely for land, without more, by a stranger, can neither amount to an ouster, or devest the owner of his title to it. And as to abandonment, this can never be presumed from lapse of time, where the plaintiff, and those from whom he derives his title, claimed and held the land, as in this case, under warrants and surveys, upon which the whole of the purchase money had been paid to the Commonwealth. Nothing short of an actual ouster of the owner from the land, in such case, by taking possession of it, and continuing to keep the same, by exercising acts of ownership at least upon it, for twenty-one years or upwards, will defeat the owner of his right to the land. But if he lies by for twenty-one years under such circumstances, with-

out making an entry upon the land, or bringing his action of equivalent for it, he will be barred by the statute of limitations.

The fourth point of the defendants was " That the patents given in evidence, under which the defendants claimed, were *primâ facie* evidence of title, and would entitle the defendants to a verdict, unless the plaintiff had shown a better title." To which the court answered " that the point is correct, but then it remained to be ascertained, whether the plaintiff had not shown a better title. For if the person obtaining the patent be not entitled to it, he acquires no title thereby. He cannot recover the land unless entitled to the patent. Our inquiry therefore is, were the heirs of Thomas Dyer entitled to this patent? If not, it cannot defeat the plaintiff's right to recover. The plaintiff sets up a title prior to the patent, and is not to be affected by the recitals in it. It appears that Jacob Eyerly paid the purchase money to the State, and that Christ and Rice, the warrantees, conveyed to him. The deeds duly proved are a part of the plaintiff's title. Nothing was done by Dyer or his heirs to authorize the issuing of the patents to them. One of the warrantees has testified before you that he gave no other deed than the one here given in evidence. The heirs of Thomas Dyer were then even the persons to whom the patents for these lands ought to have issued, and as against the elder title of the plaintiff, it cannot avail them to defeat his recovery." We think the answer of the court to this fourth point of the defendants below perfectly correct, and that the facts given in evidence, and the reasoning of the court in regard to them, show conclusively that the heirs of Thomas Dyer, to whom the patents were issued, had no right whatever to claim them. The right now vested in the plaintiff below, entitled whoever was invested with it at the time, to have had the patents; consequently, the plaintiff has the right to recover the land, in the same manner as if the patents had been issued to him, or any of those from or through whom he has derived his title.

The fifth point of the defendants was " That if the jury believed that Thomas Dyer procured the survey to be made by George Palmer, D. S., for himself, in pursuance of an arrangement between Robert Morris, or Eyerly, and himself; then this is a circumstance, taken in connexion with the neglect of Morris to perfect his title, or to look after the land, from which the jury may infer that Dyer had title to the lands." To this the court replied " that there is nothing in the case upon which this point can be raised. There is no evidence to sustain it." In this reply the court were no doubt correct, for there does not appear to have been a single tittle of evidence given, tending to show that Thomas Dyer procured the survey to be made for himself, or indeed for anybody else, either under the Christ or the Rice warrant; and without some evidence tending to prove that it was so, it would have been

error in the court to have submitted it as a fact to the jury which they might find or pass on.

The sixth point was " That the patents conveyed the legal title to these lands to the heirs of Thomas Dyer. That if William Abbot be a *bonâ fide* purchaser without notice, the plaintiff could not recover, even if otherwise entitled, without having tendered the costs of the patents with interest, and the amount of taxes paid by him with interest, before suit brought." To this the court answered, " If a man wrongfully obtain a patent, and, under claim of it, pay taxes, he cannot raise an equity in himself or his vendee, as against the real owner, to be reimbursed for the costs of patenting and taxes. If he have a right to the patent, he holds the land. The plaintiff was not bound to pay for a patent granted against his title in subversion of it, and even given in evidence to defeat it ; nor for the taxes paid by the person claiming that patent. It was issued to his injury and in wrong; and neither the wrongdoer nor his vendee can recover from the person injured what they thus paid." We perceive nothing incorrect in this answer of the court. The court in their answer speak of the patentee as a wrong-doer; that is, as having obtained the patents wrongfully, or without right; a fact which, according to the evidence, cannot be questioned. This being the case, it would be strange indeed if either he or his vendee could claim to be reimbursed money laid out in the performance of such a wrong, by the party against whom the wrong was committed; or, in other words, for attempting to defraud or cheat him out of his title to the land. Mr Abbot, the vendee, cannot be considered in the light of an innocent purchaser, for he was bound, at his peril, to know the imperfections of the title he purchased, and is entitled to no favour or protection that the patentees could not claim.

The remaining errors assigned are to the charge of the court; the first of which is an exception to what the court " said respecting the effect of the proceedings before the board of property." We however are unable to discover any error in what the court said relative to these proceedings. On the 11th of June 1792, Jacob Eyerly entered a caveat against Thomas Dyer and Thomas Wright's obtaining patents for the land in dispute. Eyerly claimed the lands by virtue of the warrants in the names of Christ and Rice respectively; but under what rights Dyer and Wright claimed does not appear until the 5th of August 1795, when Dyer entered a caveat against the Betsy Rice warrant, claiming the land under an older warrant of 1784 in the name of John Carlisle. During the pendency, however, of the caveat entered by Eyerly, he, on the 11th of February 1793, sold and conveyed the Christ and Rice warrants, with the lands claimed under them, to Robert Morris, who, by letter dated April 19th 1793, after stating therein that he had purchased of Jacob Eyerly, Jun. the lands in contest between said Eyerly and Thomas Wright, (not Dyer, observe), as

[Urket v. Coryell—Wasser v. Same.]

well as the right of the said Thomas (Wright), requested therefore that the caveat entered by the said Eyerly might be dismissed. The court below instructed the jury that " there was nothing in these proceedings, in themselves or connected with any other part of the case, which could prevent the plaintiff from recovering;" and in doing so we think they were right. It was argued, however, that Morris, by withdrawing the caveat entered by Eyerly, gave up the contest with Thomas Dyer for the land. But Morris, by the terms of his letter, only withdraws the caveat as to the lands in contest between Eyerly and Thomas Wright, and not as to those in contest between Eyerly and Thomas Dyer, assigning also at the same time his reason for doing so, to wit, that he purchased the right of Eyerly and Wright thereto. So that it is perfectly clear that Morris, by withdrawing the caveat as to the lands which had been in dispute between Eyerly and Thomas Wright, intended to concede or give up nothing whatever to Thomas Dyer: and of this, the caveat entered upwards of two years afterwards, on the 5th of August 1795, by Thomas Dyer, against the owner of the Betsy Rice warrant obtaining a patent founded upon it, is complete confirmatory evidence. For it shows to demonstration that as late as August 1795, he had no claim to the land whatever by virtue of the Betsy Rice warrant, but claimed it under an older warrant, as he then alleged, dated in 1784, in the name of John Carlisle. Indeed, it does not appear from the evidence that Thomas Dyer ever, at any time, claimed the lands in dispute, or any part thereof, by virtue of the Christ or Rice warrants, or either of them, or that he ever pretended any claim to the warrants themselves; but it would seem rather that his heirs in 1824, after his death, fabricated deeds in the names of John Christ and Betsy Rice, the warrantees, for the purpose of enabling them to obtain the patents which the defendants gave in evidence, which, as has been shown, cannot avail or aid the defendants in the least.

The second error to the charge of the court is an exception to what the court " said to the jury respecting the conveyance to the North American Land Company." This part of the charge of the court has been referred to and shown to be correct in our notice of the defendants' first point above; and therefore need not be considered again.

The third and last ground of error to the charge of the court is, that they took the whole case from the jury, and left nothing for them to decide. The facts upon which the plaintiff below founded his claim, appear to have been clearly and incontrovertibly established by the evidence adduced in support of them : no evidence whatever appears to have been given by the defendants tending to disprove them in any degree whatever. This being the case, we think that the court were justified in saying, as they did, to the jury, in the conclusion of their charge, that " there did not

[Urket v. Coryell—Wasser v. Same.]

appear any defect in his (the plaintiff's) title, or anything to have been shown by the defendants which ought to prevent his recovering."

Judgment affirmed.